**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DONNELL HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 07-cv-3982 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Donnell Harris ("Plaintiff" or "Harris"), was discharged from his employment with the Defendant City of Chicago ("Defendant" or "City"), purportedly for violating the City's Personnel Rules and Ethics Ordinance. On November 6, 2008, Plaintiff filed an eighteen-count second amended complaint [113] based on the City's investigation of Plaintiff and its resulting decision to terminate of his employment. Plaintiff alleges retaliatory discharge in violation of the First Amendment, the Illinois Constitution, and public policy (Counts I and XIII); violations of due process (Counts II – IV); violation of his equal protection rights (Count V); conspiracy in violation of 42 U.S.C. § 1983 ("Section 1983") (Count VI); race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count VII); various breaches of the Collective Bargaining Agreement ("CBA") between the City and State and Municipal Chauffeurs and Helpers Union Local 726 (Counts VIII – X); breach of contract (Count XII); intentional infliction of emotional distress (Count XIV); negligence and gross negligence (Counts XV-XVI); and violation of the Age Discrimination in Employment Act ("ADEA") (Count XVIII).[1]  Plaintiff also seeks a declaratory judgment that the City violated the CBA

_____

[1] Count XVIII previously was dismissed in an order [111] issued on June 30, 2008.

(Count XI) and a common law *writ of certiorari* review of the Human Resources Board's decision upholding Plaintiffs termination (Count XVII).

This matter is before the Court on the City's motion for summary judgment [143]. For the reasons set forth below, the Court grants Defendant's motion for summary judgment as to Counts VI, VII, and the Section 1983 claims set forth in Counts I through V of Plaintiff's second amended complaint. In view of that disposition, which results in the dismissal of all claims over which the Court has original jurisdiction, Plaintiff's state law claims – the state constitutional claims set forth in Counts I through V and Counts VIII through XVII of his second amended complaint – are dismissed without prejudice pursuant to the "usual practice" in the Seventh Circuit when "all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).[2]

I. **Background**

A. **Procedural Background**

On December 12, 2006, the City terminated Plaintiff's employment as a street sweeper for the City's Department of Streets and Sanitation ("DSS"). Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the City of Chicago on February 16, 2007, alleging that his discharge constituted race discrimination in violation of Title VII of the Civil Rights Act. Plaintiff also appealed his discharge to the Human Resources Board of the City of Chicago (the "HR Board"). On August 21, 2007, after holding a hearing on the matter, the HR Board upheld Plaintiff's termination.

---

[2] In view of the dismissal without prejudice of Plaintiff's state law claims, the Court strikes without prejudice Plaintiff's motion to vacate the order of the Human Resources Board [139]. That motion was brought in support of Plaintff's writ of certiorari claim (Count XVII), which is among the claims that have been dismissed and may be refiled in state court (see pp. 34-36, *supra*; see also 735 ILCS 5/13-217).

On July 16, 2007, Plaintiff initiated the instant suit by filing a *pro se* complaint against the City. Two months later, on September 6, 2007, Plaintiff filed an action for a writ of certiorari in the Circuit Court of Cook County, challenging the decision of HR Board upholding his termination. With the assistance of appointed counsel, Plaintiff filed a first amended complaint on January 8, 2008. The City moved to dismiss Plaintiff's first amended complaint. On June 30, 2008, this Court granted in part and denied in part the City's motion, dismissing Plaintiff's ADEA claim for failure to exhaust his administrative remedies [77]. This Court also denied Plaintiff's subsequent motion for leave to retain the ADEA claim [111].

On April 14, 2008, Plaintiff sought leave to amend his complaint to add his common law writ of certiorari claim; the Court granted that motion on May 21, 2008. Plaintiff filed a second amended complaint on November 6, 2008 [113]. The City's motion for summary judgment is directed against that complaint.

### B.    Factual Background

The Court takes the relevant facts primarily from the parties' Local Rule ("L.R.") 56.1 statements[3]: Defendant's Statement of Facts ("Def. SOF") [145], Plaintiff's Response to

---

[3] L.R. 56.1 requires that statements of facts contain allegations of material fact and that factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000). The Seventh Circuit repeatedly has confirmed that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g., Koszola v. Bd. of Educ. of the City of Chicago,* 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon,* 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. See, *e.g., Malec,* 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g., Malec,* 191 F.R.D. at 584 (citing *Midwest Imports,* 71 F.3d at 1317). Similarly, the Court disregards a denial that, although supported by admissible record evidence, does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle new facts into its response to a

Defendant's L.R. 56.1 Statement and Statement of Additional Facts ("Pl. SOF") [161], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp.") [170].[4]

Plaintiff first was employed by the City as a seasonal motor truck driver in 1996. Def. SOF ¶ 2. In June 1998, the City hired Plaintiff as a full-time motor truck driver for the Department of Streets and Sanitation ("DSS"). Def. SOF ¶ 2. While he was employed by the City, Plaintiff was a member of the State & Municipal Teamsters, Chauffeurs & Helpers Union Local 726, which has a collective bargaining agreement (CBA) with the City of Chicago. Def. SOF ¶ 67.

## 1. Relevant City of Chicago Personnel Rules and the Ethics Ordinance

The City of Chicago has promulgated various Personnel Rules. Personnel Rule XVIII governs disciplinary actions and procedures for career service employees. Section 1 of Personnel Rule XVIII provides that certain conduct, "when engaged in by an employee, will result in disciplinary action which may include discharge." Def. SOF ¶ 10. The prohibited conduct includes: "(6) Failing to disclose any information requested or providing a false or misleading answer to any question in any application, questionnaire, information form or other document provided by the City"; "(8) Making false, inaccurate or deliberately incomplete statements in an official inquiry, investigation or other official proceeding"; "(15) Engaging in any act or conduct prohibited by the Municipal Code of the City of Chicago, the Illinois Compiled Statutes, applicable laws of other states, or federal statutes"; "(31) Using the office, work site, work locations, work vehicle, work tools or work materials and supplies to conduct a

---

party's L.R. 56.1 statement of fact. See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).
[4] Defendant argues that the Court should disregard or strike portions of Plaintiff's Response to Defendant's L.R. 56.1 Statement and Statement of Additional Facts on the grounds that Plaintiff's submission contains unsupported assertions of fact, assertions that lack proper foundation, and conclusory statements. As noted above, it is the Court's usual practice to disregard improperly supported denials and fact statements, and the Court has done so in this case.

secondary business, trade or occupation; "(43) Failure to comply with the requirements of secondary employment as delineated in Personnel Rule XX, Section 3"; "(45) Any act or conduct in violation of, or failing to perform any duty required by, the Ethics Ordinance, Chapter 2-156 of the Municipal Code of Chicago, as amended"; and "(50) Conduct unbecoming any officer or public employee." Def. SOF ¶ 10.

Personnel Rule XX, Section 3 relates to outside employment, which is defined as "any paid employment performed by an employee in addition to his or her employment with the City." The rule also requires "[a]ny employee desiring to perform outside employment [to] first file a request in writing with her or his department head for permission to engage in outside employment."

The Ethics Ordinance, which appears at Section 2-156-110 of the Chicago Municipal Code, provides, in relevant part, that: "no elected official or employee shall have a financial interest in his own name or in the name of any other person in any contract, work or business of the city." See Def. SOF ¶ 8; Chi., Ill. Municipal Code § 2-156-110. The Municipal Code expressly excludes from the definition of "financial interest" "any interest of the spouse or domestic partner of an official or employee which interest is related to the spouse's or domestic partner's independent occupation, profession or employment." Chi., Ill. Municipal Code § 2-156-010(l).

### 2. Dean Trucking

In mid 2000, Plaintiff's wife, Gloria Harris, started a trucking company, Dean Trucking. Pl. SOF ¶ A3. Mrs. Harris was the president, sole shareholder, and sole director of Dean Trucking. Pl. SOF ¶ A3. Between 2001 and 2004, Dean Trucking did business with the City

pursuant to contracts known as the Hired Truck Program. Ex. 21 to [162] at 26 (3/14/07 HR Board Tr.).

In March 2004, Dean Trucking was suspended from the Hired Trucking Program. Ex. 17 to [162] at 67. Dean Trucking was notified of the suspension by letter dated March 2, 2004 and signed by Bob Benson ("Benson"), Hired Truck Program Manager. *Id.* Some time after the suspension, Mario Esquivel ("Esquivel"), a Field Analyst in the City's Office of Budget and Management, and Benson exchanged a number of e-mails regarding Dean Trucking. Def. SOF ¶ 17-18; Pl. SOF ¶ A21, A27.[5] In that e-mail chain, Esquivel referred to Plaintiff's wife as "the mother trucker," and Benson joking asked whether Plaintiff and his wife were dead. *Id.*

Dean Trucking stopped doing business in 2004. Pl. SOF ¶ A25.

### 3.     Media Coverage and the Inspector General's Investigation

In late March 2005, the Chicago Sun-Times published articles referencing Plaintiff and his alleged connections to Dean Trucking. Def. SOF ¶ 14. One of those articles indicated that the City Inspector General was investigating Plaintiff. Pl. SOF ¶ A30. At the time that the articles were published, Lisa Schrader held the position of public information officer in the Office of Budget and Management. Schrader Dep. at 6. At her deposition, Schrader testified that she spoke to Chicago Sun-Times reporters prior to March 2005, but that she did not recall speaking to reporters regarding Plaintiff or Dean Trucking. Schrader Dep. at 54-55.

Shortly thereafter, in April 2005, Kristopher Collins Brown ("Brown"), an investigator with the City's Inspector General's Office, was assigned to investigate Plaintiff and Dean Trucking. Def. SOF ¶ 14. The Inspector General's Office investigates the performance of

---

[5] Both parties cite to the e-mail chain, see Def. SOF ¶ 17-18; Pl. SOF ¶ A27, A21, and Plaintiff's discrimination claims rely in part on statements contained in the e-mail chain. However, inexplicably, both parties also object to the other side's citation of the document, see Pl. SOF ¶ R18.7; Def. Resp. A21. Neither objection is well taken in view of the parties' mutual reliance on the document in question.

governmental officers, employees, functions and programs, either in response to complaint or on the inspector general's own initiative, in order to detect and prevent misconduct, inefficiency and waste within the programs and operations of the city government. Def. SOF ¶ 13.

In connection with his investigation, Brown and his supervisor, Stephanie Lionts, interviewed Plaintiff on September 9, 2005. Def. SOF ¶ 28. That interview was transcribed by a court reporter. Def. SOF ¶ 28.

In a summary report dated June 27, 2006, Brown concluded, based on his investigation, that Plaintiff had violated Personnel Rule XVIII, Section 1, Paragraphs 6, 8, 31, 43 and 45, and recommended that Plaintiff's employment be terminated. Def. SOF ¶ 37; Attach. 8 to Ex. N to [145] (Summary Report). The report listed the following specific violations: violation of Paragraph 6 by "fail[ing] to disclose and update his Dual Employment Reports"; violation of Paragraph 8 by "den[ying] that he ever filed or was required to file a Dual Employment Report related to his work for Dean Trucking"; violation of Paragraph 31 by "[keeping] and us[ing] a Dean Trucking radio in his City sweeper"; violation of Paragraph 43 by "fail[ing] to disclose his employment with Dean Trucking"; and violation of Paragraph 45 by "violat[ing] * * * the rules regarding secondary employment rule and financial interest in city business." Attach. 8 to Ex. N to [145] (Summary Report). The Inspector General's Office forwarded this recommendation, along with the investigative file, to the DSS and the Department of Law. Def. SOF ¶ 37.

### 4. The Advisory Opinion Issued by the Board of Ethics

After receiving a copy of the Inspector General's report, the Law Department requested that the Board of Ethics determine whether Plaintiff had violated the City's Ethics Ordinance, which is codified at Section 2-156-110 of the Chicago Municipal Code. Ex. V to [145] at 1

(Board of Ethics Advisory Opinion).[6] The Board of Ethics based its analysis on a summary of facts provided by Assistant Corporation Counsel Hillina Tamrat. Def. SOF ¶ 38. On October 20, 2006, the Board of Ethics issued an Advisory Opinion opining that, based on the facts provided by the Law Department, Plaintiff had violated the Ethics Ordinance "by having a financial interest – in the name of another – in City business by virtue of the participation of Dean Trucking in the Hired Truck Program." Def. SOF ¶ 39; D's Ex. V at 1. The Board of Ethics concluded that the financial interest was not related to Mrs. Harris's "independent occupation, profession or employment." D's Ex. V at 10.

### 5. Plaintiff's Termination

Tenaya Williams ("Williams"), the then-Assistant Commissioner of the DSS, reviewed the Inspector General's recommendation and the Ethics Board's Advisory Opinion regarding Plaintiff and Dean Trucking and decided to initiate Plaintiff's termination process. Def. SOF ¶ 41. On November 29, 2006, Plaintiff received a notice that he was required to meet with Williams the next day regarding his employment status, and that his union representative had been informed of the meeting. Def. SOF ¶ 42. On November 30, 2006, Plaintiff and his union representative met with Williams. Def. SOF ¶ 43. At that meeting, Williams gave Plaintiff a copy of the Inspector General's report, the Board of Ethics Advisory Opinion, and a document entitled "Statement of Charges and Explanation of Evidence." Def. SOF ¶ 44. Williams informed Plaintiff that he had five days to response to the charges. Def. SOF ¶ 44.

On December 7, 2006, Plaintiff delivered a letter addressed to DSS Commissioner Picardi stating that he "den[ied] the charges and wish[ed] to pursue [the] matter further." Def.

---

[6] Plaintiff objects that the Advisory Opinion is inadmissible because it contains and relies on hearsay statements, and other inadmissible evidence. The Court does not rely on the statements contained in the Advisory Opinion in analyzing the City's motion for summary judgment. Rather, it simply references the opinion in order to provide a complete background of the events leading up to the termination of Plaintiff's employment.

SOF ¶ 46. Shortly thereafter, Plaintiff received a letter dated December 12, 2006 notifying him that his employment with the City was terminated, effective that day. Def. SOF ¶ 47.

### 6. Appeal to the Human Resources Board

The Human Resources Board ("HR Board"), which exists pursuant to City of Chicago Municipal Code Section 2-74-040, consists of three members who are appointed by the mayor for five-year terms. Def. SOF ¶ 48. The HR Board conducts hearings of appeals by career service employee of discharge, demotion, or suspension for a period of more then ten days upon the request of the employee. Def. SOF ¶ 48. Plaintiff appealed his discharge to the HR Board. Def. SOF ¶ 49.

Hearing Officer Joseph Chico presided over the HR Board hearing regarding Plaintiff's discharge on March 14, 2007, March 22, 2007, April 19, 2007, and May 17, 2007. Def. SOF ¶ 49. Plaintiff was represented by an attorney at the hearing, presented witnesses, cross-examined the City's witnesses, and testified in his own defense. Def. SOF ¶ 49. Hillina Tamrat represented the City at the hearing. Def. SOF ¶ 49. A number of witnesses, including Brown, appeared as witnesses at the hearing, and were cross-examined by Plaintiff's attorney. Def. SOF ¶ 49. On June 21, 2007, Hearing Officer Chico issued a Hearing Officer's Report to the HR Board. Ex. CC to [145] (Hearing Officer Report).[7] In that report Hearing Officer Chico concluded that Plaintiff "engaged in improper and unethical conduct because [he] had an economic interest in Dean Trucking * * * because [he] advised and consulted with Ms. Gloria Dean Harris, his wife, regarding company business." Exhibit CC to [145], at 9. Hearing Officer

---

[7] Plaintiff argues that the Hearing Officer's Report is inadmissible and cannot provide proper evidentiary support for the City's statements of facts because it is based on hearsay statements and other inadmissible evidence. Pl. SOF ¶ R49.2. The Court does not rely on the statements contained in the Hearing Officer's Report in analyzing the City's motion for summary judgment. Rather, it simply references the report in order to provide a complete background of the events leading up to the termination of Plaintiff's employment.

Chico also concluded that Plaintiff "drove trucks for Dean Trucking Company and * * * failed to notify the Department of his dual employment with Dean Trucking Company which is in violation of the City of Chicago, Personnel Rules and Standards." Exhibit CC to [145], at 9. Based on these findings, Hearing Officer Chico recommended that Plaintiff's discharge be upheld. Def. SOF ¶ 50.

Plaintiff requested oral argument before the full board, which was taken on August 21, 2007. Def. SOF ¶ 50. After oral argument, the HR Board upheld Plaintiff's termination. Def. SOF ¶ 50; Ex. C to [145] (Findings and Decision of the HR Board).

### 7.    Plaintiff's Allegedly Protected Speech

Plaintiff testified that some time in February or March 2004, a person who introduced himself as an agent of the Federal Bureau of Investigations (FBI) and a second person who introduced herself as an agent of the Department of Treasury arrived at Plaintiff's home to ask him questions regarding their investigation of the City's Hired Truck Program. Def. SOF ¶ 51. Plaintiff testified that he informed the agents that "mostly white" City workers were testing positive for dope and that their supervisors were covering it up. Def. SOF ¶ 52. Plaintiff never told Picardi or Williams about his conversations with the FBI. Def. SOF ¶ 53. Plaintiff testified that no City employee did anything or said anything that led Plaintiff to believe they knew about his 2004 conversation with the FBI. Def. SOF ¶ 53.

On February 17, 2007, following his termination, Plaintiff filed a complaint with the FBI, the United States Attorney's office, the Department of Justice, the Illinois Department of Human Rights, the Equal Employment Opportunity Commission. Def. SOF ¶ 54.

## II.    Legal Standard on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    Section 1983 Conspiracy Claim (Count VI) and ADEA Claim (Count XVIII)

Plaintiff has elected not to pursue the claims set forth in Counts VI and XVIII of the second amended complaint for purposes of the City's motion for summary judgment. Specifically, in his response brief, Plaintiff indicated that he would no longer pursue his Section 1983 conspiracy claim (Count VI) [162, 10]. Accordingly, the City's motion is granted as to Count VI. With respect to the ADEA claim, Plaintiff acknowledges in the second amended

complaint that this Court previously has dismissed that claim and denied Plaintiff leave to retain it. According to Plaintiff, he included the ADEA claim in his second amended complaint "solely for purposes of preserving rights on appeal." [113, 54]. Because that claim no longer is pending before this Court, the Court need not address it on the merits in this opinion.

**B.      Plaintiff's Claims of Municipal Liability Under Section 1983 (Counts I-V)**

Plaintiff alleges five causes of action against the City for constitutional deprivations pursuant to Section 1983. Count I alleges that the City terminated Plaintiff's employment in retaliation for him exercising his First Amendment rights. Count II alleges that the City deprived Plaintiff of his property interest in his continued employment by terminating his employment without notice, without an opportunity to be heard and without cause in violation of the due process clause of the Fourteenth Amendment. Count III also is a due process claim, alleging that the City deprived Plaintiff of his liberty interest in suitable employment by informing the press about the Investigator General's investigation of Plaintiff, and terminating Plaintiff without providing him with a meaningful opportunity to clear his name, thereby stigmatizing Plaintiff as an undesirable employee. In Count IV, Plaintiff asserts that the Ethics Ordinance and Personnel Rule XVIII, which Plaintiff was terminated for violating, are unconstitutionally vague. Finally, Count V is an equal protection claim alleging that the City terminated Plaintiff based on his race and color.[8]

The City moves for summary judgment on Plaintiff's Section 1983 claims on the grounds that Plaintiff has failed to establish municipal liability for his alleged constitutional deprivations. A municipality is not liable under Section 1983 unless the constitutional violations at issue are caused by a municipal policy or custom. See *Monell v. Department of Soc. Servs.,* 436 U.S. 658,

---

[8] Counts I through V also assert claims arising under the Illinois Constitution. Plaintiff's state constitutional claims are addressed in Section D below.

694 (1978). The "official policy" requirement for Section 1983 liability is designed to "distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986). "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their policies rather than misconduct by their workers.'" *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Fairley v. Fermaint,* 482 F.3d 897, 904 (7th Cir. 2007)). A plaintiff may establish municipal liability by showing that the constitutional deprivation was caused by (1) the enforcement of an express policy; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) a person with final policymaking authority. *Kujawski v. Board of Com'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999).

## 1. Count I – First Amendment Retaliatory Discharge

### a. Whether a Basis for Municipal Liability Exists

With respect to Count I, Plaintiff relies on the third potential avenue for establishing *Monell* liability, arguing that his constitutional injury was caused by final policymakers. Plaintiff submits that the City delegated final policymaking authority to the DSS and the Human Rights Department (of which the HR Board is a subdivision, according to Plaintiff), and therefore the City can be held liable for their decision to terminate Plaintiff, allegedly in violation of his free speech rights.

Whether a particular official has final policymaking authority is a question of state law. See *Duda v. Board of Ed. of Franklin Park Public Sch. Dist. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998). Simply because an official has discretion to act or "authority to make administratively final decisions" does not make that individual a final policymaker for purposes of *Monell*

liability. *Radic v. Chicago Transit Authority,* 73 F.3d 159, 161 (7th Cir. 1996); see also *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) ("just because Owen is the *decisionmaker* on hiring/firing decisions for the Village government does not necessarily make him the *policymaker* on those issues"); *Kujawski*, 183 F.3d at 740 (noting the "well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority"). Seventh Circuit precedent teaches that policymakers are those who possess "authority to adopt rules for the conduct of government." *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988) (in identifying "policymaking officials * * * we can be confident that state law * * * will always direct a court to some official or body that has the responsibility for making law or setting policy")); see also *Rasche v. Village of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003) ("[i]n order to have final policymaking authority, an official must possess '[r]esponsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government'").

Under Illinois law, the city council possesses the requisite authority to adopt rules for the conduct of government, and thus is considered the policymaking authority. See *Rasche*, 336 F.3d at 601 (generally "the policymaking authority in the city structure will be the city council"). Consequently, the Chicago City Council has final policymaking authority for the City. The pertinent inquiry here, then, is whether the Chicago City Council has delegated "authority to set policy for hiring and firing" to the entities that made the decision to fire Plaintiff – namely, the DSS and the HR Board. *Kujawski*, 183 F.3d at 740; see also *Valentino*, 575 F.3d at 676 ("inquiry is * * * whether [official] is a policymaker 'in a particular area, or on a particular issue'").

Plaintiff cites no evidence in support of his contention that the City has delegated final policymaking authority to either the DSS or the HR Board. Nor has the Court otherwise found any reason to conclude that the City delegated policymaking authority with respect to personnel decisions to the DSS. See *Citizens For Community Action v. City of Chicago*, 455 F.Supp.2d 802, 813-14 (N.D. Ill. 2006) (holding that violations of plaintiff's First Amendment rights by DSS employee could not be imputed to the City because there was no evidence that the City Council delegated policymaking authority to the DSS). Moreover, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies * * * are the act of the municipality." *Waters v. City of Chicago*, 2009 WL 2767141, at *7 (7th Cir. Sept. 2, 2009) (quoting *Praprotnik,* 485 U.S. at 127). Here, Williams, the then-Assistant Commissioner of the DSS who made the decision to terminate Plaintiff, did not have unfettered discretion to fire employees. Rather, Personnel Rule XVIII, which "embodies the policy for the types of conduct for which disciplinary action should be taken," "constrained" her "authority and responsibility to initiate disciplinary action." *Id.* (finding that the Commissioner of the City's Department of Transportation, who made the final decision to terminate the plaintiff, did not have policymaking authority, in part, because her decision was constrained by the Personnel Rule XVIII). Therefore, neither Williams nor DSS possessed final policymaking authority.

Turning to the HR Board, Plaintiff's unsupported assertion that the HR Board possesses final policymaking authority lacks merit. In fact, in a case decided after briefing was completed on the City's motion, the Seventh Circuit addressed the question of what entities possess final policymaking authority for the City of Chicago in employment matters. *Waters*, 2009 WL 2767141, at *5. The court concluded that, because "[t]he City Council has delegated the authority to promulgate personnel rules to the Commissioner of Human Resources," the

Commissioner is a final policymaker for the City in the area of employment. *Id.* (citing Chi., Ill. Municipal Code § 2-74-050, which authorizes the commissioner of human resources to issue personnel rules). By contrast, the Chicago Municipal Code does not give the HR Board the authority to promulgate rules or otherwise make policy. Rather, the Code authorizes the HR Board to act as an advisory body to the mayor and to the commissioner of human resources on issues of "public personnel administration including, but not limited to, manpower utilization, manpower training, employee grievances and employee salaries, in addition to other duties as provided by this chapter." Chi., Ill. Municipal Code § 2-74-040. In the instant case, there is no evidence that the Commissioner of Human Resources played any role in the decision to terminate Plaintiff, or the HR Board's decision upholding that termination. Nor does the Plaintiff provide any basis for simply equating the HR Board with the HR Commissioner. Therefore, the HR Board is not a final policymaker.

### b. *The Merits of Count I*

Moreover, even if Plaintiff had presented evidence to establish that the DSS and/or the HR Board was a final policymaker with respect to employment policy, the City is entitled to summary judgment on Plaintiff's Section 1983 retaliation claim because Plaintiff failed to establish a *prima facie* case of retaliation. "In order to establish a prima facie case of unlawful First Amendment retaliation, a public employee must establish that: (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter her from exercising her First Amendment rights; and (3) her speech was a motivating factor in her employer's adverse action." *Valentino*, 575 F.3d at 670. Here, Plaintiff failed to present *any* evidence to establish a causal connection between his exercise of his First Amendment rights and the Board's decision to uphold his termination.

Plaintiff's retaliation claim is based on statements that he made to the FBI in 2004 and complaints that he filed with the FBI, the United States Attorney's office, the Department of Justice, the Illinois Department of Human Rights, the Equal Employment Opportunity Commission in February 2007. The Court will address each claimed incident of protected speech in turn.

Even assuming for purposes of this motion that Plaintiff's 2004 statements to the FBI constitute protected speech, Plaintiff has introduced no evidence that either the DSS or the HR Board even was aware of Plaintiff's 2004 speech. That omission alone is fatal to Plaintiff's claims. See *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999) ("In order to establish that a defendant retaliated against a plaintiff because of a protected constitutional right, a plaintiff must demonstrate that the defendant * * * knew of the plaintiff's constitutional activities."). In addition, more than two and a half years passed between the time that Plaintiff spoke to the FBI in 2004 and his termination by DSS in December 2006. "The inference that protected speech was the motive for an adverse employment decision weakens as the time between the protected expression and the adverse action increases, and additional proof of a nexus is required." *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008). Here, Plaintiff fails to provide such additional proof. Therefore, there is insufficient evidence from which a jury could conclude that Plaintiff's 2004 speech was a motivating factor in the City's decision to fire him. See *id.* ("A twenty-month gap between speech and action is too long to support an inference of a causal connection between the two in the absence of any other evidence of improper motive."); *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) (the nearly two-year time gap between a letter and an adverse action is too attenuated to provide evidence that the letter motivated the adverse action).

Turning to Plaintiff's 2007 statements, the Court again will assume for purposes of this motion that those statements are protected. The 2007 speech occurred after the DSS terminated Plaintiff, and therefore could not have been a motivating factor in that decision. See *Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003) ("[i]t is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against [him] for engaging in statutorily protected activity"). Plaintiff concedes this point, but nonetheless claims that his 2007 speech was a motivating factor in the HR Board's decision to uphold his termination. Plaintiff relies exclusively on the fact that the HR Board's decision followed his 2007 speech to demonstrate that an improper purpose was a motivating factor in that decision. While "[a] plaintiff may demonstrate improper motive with evidence that the adverse decision 'took place on the heels of protected activity,' * * * 'the fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation.'" *George v. Walker*, 535 F.3d 535, 538 (7th Cir. 2008) (quoting *Mullin*, 450 F.3d at 285). Moreover, the chain of events leading to the HR Board's review of the DSS's termination decision already was in motion when Plaintiff filed his complaints. Therefore, the mere fact that the HR Board's decision followed Plaintiff's complaints in time does not support an inference of a causal connection between the two. See *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality"); *Watts v. SBC Services, Inc.*, 2006 WL 2224054, at *10 (N.D. Ill. July 31, 2006) (finding no evidence to support an inference of a causal connection between plaintiff's complaint and her termination where "the chain of events leading to Watts' termination * * * was set into motion months before she complained"). Therefore, Plaintiff has

failed to set forth sufficient evidence to create a genuine issue of material fact that his speech was a motivating factor in the City's decision to terminate his employment. For these reasons, the Court grants the City's motion on Plaintiff's Section 1983 retaliation claim.

### 2. Count II – Due Process Property Interest

#### a. *Whether a Basis for Municipal Liability Exists*

Plaintiff's argument for municipal liability on Count II mirrors the argument that he advanced with respect to Count I – namely, that the DSS and HR Board are final policymakers such that the City can be held liable for their decision to terminate Plaintiff, allegedly in violation of his due process rights. As discussed above, Plaintiff has failed to show that either the DSS or the HR Board possesses policymaking authority in the area of employment. Therefore, there is no basis for imposing municipal liability.

#### b. *The Merits of Count II*

Plaintiff's due process property interest claim also fails on the merits. To state a Fourteenth Amendment claim for the deprivation of a property interest without due process, Plaintiff must demonstrate that (1) he had a constitutionally protected property interest, and (2) he was deprived of that interest without due process. *Kim Constr. Co., Inc. v. Board of Trustees of Village of Mundelein*, 14 F.3d 1243, 1245 (7th Cir. 1994). Plaintiff contends that he has a property interest in his job with the City by virtue of the CBA, and that the City violated his due process rights by failing to provide him with meaningful pre-termination process.

The Court will assume for purposes of this analysis that Plaintiff had a legally protected interest in continued employment with the City. Therefore, the only question is whether Plaintiff received adequate pre-termination process. Plaintiff complains that the City did not comply with various procedural requirements set forth in the CBA, including failing to provide him with 30 days advance notice of his termination and an opportunity to first meet with his immediate

supervisor. But a "procedure required by contract, statute, or regulation does not create a constitutionally protected right nor does violation of a contract, statute, or regulation, by itself, constitute a violation of due process." *Fenje v. Feld*, 301 F.Supp.2d 781, 802 (N.D. Ill. 2003) (collecting cases). As the Seventh Circuit explained in *Campbell v. City of Champaign*, 940 F.2d 1111, 1113 (7th Cir.1991):

> "When the claimed deprivation of property is the loss of a job, the entitlement must be to a job, rather than just to a set of disciplinary procedures. '[A] contract that creates merely a right to procedure does not create a property right within the meaning of the due process clause.' So even if the contract in this case be construed as *entitling* the plaintiff to progressive discipline, the breach would not be a deprivation of *property*." (Citation omitted).

In short, even if the City failed to follow CBA-proscribed procedures, that failure is not a due process violation.

With respect to pre-termination process, the Supreme Court and the Seventh Circuit have stated that "due process 'requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.'" *Bodenstab v. County of Cook*, 569 F.3d 651, 663 (7th Cir. 2009) (quoting *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985)). The scope of that right to pre-termination process varies based on the adequacy of post-termination remedies. *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 536 (7th Cir. 2008). Where "adequate post-termination proceedings exist, a pretermination hearing need only provide 'an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Id.* at 536-37 (quoting *Loudermill,* 470 U.S. at 542); see also *Swank v. Smart*, 898 F.2d 1247, 1256 (7th Cir. 1990) ("Only if there is no provision for a post-termination hearing must the pre-termination hearing provide all the procedural safeguards to which due process entitles a [person].").

Here, Plaintiff requested and received a four-day hearing regarding his termination as well as an oral argument before the full HR Board, after which the HR Board upheld the City's decision. Plaintiff was represented by an attorney at the hearing and was permitted to present witnesses and cross-examine the City's witnesses. Thus, in this case, the post-termination proceedings exceeded what is constitutionally required in a termination hearing for a public employee. See *Fenje*, 301 F. Supp. 2d at 803 (there is no constitutional right to have counsel present, confront witnesses or present live witnesses at such hearings) (collecting cases). In light of these post-termination protections, the City was required to provide only "truncated" pre-termination process consisting of "'oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'" *Michalowicz*, 528 F.3d at 537 (quoting *Gilbert v. Homar*, 520 U.S. 924, 929 (1997)).

Plaintiff received at least that degree of process. It is undisputed that on November 30, 2006, Williams gave Mr. Harris a document entitled "Statement of Charges and Explanation of Evidence." According to Plaintiff, that document simply listed the Personnel Rules at issue but did not explain how they were violated. It also is undisputed that Williams gave Plaintiff a copy of the Inspector General's report and the Board of Ethics Advisory Opinion. The Inspector General's report explains how Plaintiff allegedly violated each of the Personnel Rules, thus satisfying the requirement that Plaintiff be given written notice of the charges against him. Both the Inspector General's report and the Advisory Opinion explained the evidence against Plaintiff. And Plaintiff was given five days to respond and tell his story. Therefore, Plaintiff received sufficient pre-termination process, and the City's motion for summary judgment is granted on Plaintiff's federal due process property interest claim.

### 3.     Count III – Due Process Liberty Interest

Plaintiff also argues that a final policymaker is responsible for the constitutional deprivation alleged in Count III – namely, property deprivation without due process. Count III is based on Plaintiff's contention that Lisa Schrader of the Office of Budget and Management informed the Sun Times about the Inspector General's investigation. In response to the City's *Monell* argument, Plaintiff contends that Lisa Schrader and/or the Office of Budget and Management had final policymaking authority with respect to communications with the media.

As discussed above, the Chicago City Council is considered the City's policymaking authority. Plaintiff cites no evidence to support an inference that the City Council has delegated final policymaking authority to Schrader and/or the Office of Budget and Management. As the Seventh Circuit consistently has stressed, summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Calle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005). Therefore, the Court must conclude that neither Schrader nor the Office of Budget and Management possessed final policymaking authority. Consequently, there is no basis for municipal liability on the Section 1983 claim set forth in Count III; the City's motion is granted on that claim.

### 4.     Count IV – Void for Vagueness

#### a.     *Whether a Basis for Municipal Liability Exists*

Plaintiff maintains that the Ethics Ordinance and Personnel Rule are themselves express City policies, such that the City is liable for any Constitutional deprivations that they may cause. Plaintiff further contends that enforcement of those rules against him violated his due process

rights. For present purposes, the Court assumes that the challenged provisions are the moving force behind Plaintiff's claimed injury and turns to the merits of Count IV.

### b. *The Merits of Count IV*

A rule, regulation, or law can be facially unconstitutional as "impermissibly vague if it fails to define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and it fails to establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61,* 251 F.3d 662, 666 (7th Cir. 2001) (citation omitted). The void-for-vagueness doctrine is rooted in due process and concerned with "fair and reasonable warning." *United States v. Pitt-Des Moines, Inc.,* 168 F.3d 976, 987 (7th Cir. 1999). The general test for vagueness of a statute or regulation is whether it is so vague that "'men of common intelligence must necessarily guess at its meaning.'" *Penny Saver Publications v. Village of Hazel Crest,* 905 F.2d 150, 155 (7th Cir. 1990) (quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127 (1926)).

Where, as here, the law at issue "does not reach constitutionally protected conduct[,] * * * the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Fuller*, 251 F.3d at 666-67 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497 (1982)). If the enactment clearly proscribes the plaintiff's conduct, then the void-for-vagueness claim must fail, because a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 667 (quoting *Hoffman Estates*, 455 U.S. at 494-95).

Plaintiff contends that the Ethics Ordinance is unconstitutionally vague because it does not adequately define the term "financial interest." The Ethics Ordinance prohibits City employees from having a "financial interest in his own name or in the name of any other person

in any contract, work or business of the city." Chi., Ill. Municipal Code § 2-156-110. The Municipal Code expressly excludes from the definition of "financial interest" "any interest of the spouse or domestic partner of an official or employee which interest is related to the spouse's or domestic partner's independent occupation, profession or employment." Chi., Ill. Municipal Code § 2-156-010(l). According to Plaintiff, there are no enforcement guidelines to help officials determine whether an interest "is related to the spouse's or domestic partner's independent occupation, profession or employment," or actually is an employee's own interest "in the name of another."

Here, the HR Board upheld Plaintiff's discharge for violating Personnel Rule XVIII by "engag[ing] in improper and unethical conduct" based on the following findings: Plaintiff "advised and consulted with Ms. Harris, his wife, regarding [Dean Trucking] business[,] * * * completed Dean Trucking Company documentation such as Mack truck vehicle registrations and truck purchasing agreements[,] * * * was insured as a driver for Dean Trucking Company[,] and * * * drove trucks for Dean Trucking Company." (see Ex. CC). A person of common intelligence would understand that where a City employee engaged in such conduct – playing the role of advisor, consultant, clerical worker, and driver for a trucking company – the company could not be considered the employee's spouse's *independent* occupation. Because the Ethics Ordinance clearly proscribes the conduct in which Plaintiff was found to have engaged, his void-for-vagueness claim must fail. *Fuller*, 251 F.3d at 667.[9]

_____

[9] Whether Plaintiff in fact engaged in the alleged conduct is not relevant to the Court's analysis. The pertinent question is whether the ordinance defines the prohibited conduct "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *U.S. v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 986-87 (7th Cir. 1999). Because the conduct for which Plaintiff was terminated is clearly prohibited by the ordinance, he cannot sustain a void for vagueness claim.

Plaintiff also contends that Personnel Rule XVIII, Section 1, paragraph 50, providing that City employees can be discharged for conduct unbecoming a public employee, is unconstitutionally vague. However, Plaintiff does not provide any substantive argument as to how that provision is not sufficiently definite. In addition, there can be no doubt that the conduct for which Plaintiff was terminated – violating the City's Ethics Ordinance and six other provisions of its Personnel Rules – constitutes "conduct unbecoming a public employee." See *Fuller*, 251 F.3d at 667. Therefore, Plaintiff's void for vagueness claim fails.

### 5. Count V – Equal Protection Discrimination

As discussed in Section C below, Plaintiff's Equal Protection claim fails on the merits. Therefore, the Court need not address whether a basis for municipal liability exists as to that claim.

### C. Discrimination Claims (Counts V and VII)

In Counts V and VII, Plaintiff alleges that the City discriminated against him by denying him a pre-disciplinary hearing and terminating his employment based on his race, in violation of Title VII and the Equal Protection Clause of the Fourteenth Amendment. In order to establish a Title VII claim or an Equal Protection violation under Section 1983, a plaintiff must demonstrate that he "has been the victim of intentional discrimination * * * either [by] offer[ing] direct proof of discrimination or [by] rely[ing] on indirect evidence using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting method of proof." *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1037-38 (7th Cir. 2003) (citation omitted). Therefore, the Court will address these claims together. Plaintiff argues that he has made out a case for discrimination based on both methods of proof.

### 1. Direct Method

A plaintiff proceeding under the direct method of proof must provide evidence – whether direct or circumstantial – that "'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (quoting *Burks v. Wisconsin Dep't of Tranp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006)). The Seventh Circuit has characterized direct evidence of discrimination as akin to "an admission by an employer or some sort of 'smoking gun' that points to discrimination." *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005). Alternatively, circumstantial evidence of discrimination is that which "provides the basis for an inference of intentional discrimination." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). The Seventh Circuit has explained that in order to give rise to such an inference, the plaintiff must "construct[] a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Isbell,* 418 F.3d at 794 (citations omitted).

Three categories of circumstantial evidence generally can be used to establish intentional discrimination under the direct approach: (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the plaintiff was qualified for, but failed to receive the desired treatment, and the employer's stated reason for the for the difference is pretext. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

Plaintiff argues that the following circumstantial evidence, taken together, would allow a reasonable jury to infer that the City terminated his employment because he is African-

American: (1) the Ethics Board's advisory opinion refers to Plaintiff as a "minority male" on three separate occasions; (2) an April 2004 e-mail exchange between two City employees – Mario Esquivel and Bob Benson – referred to Plaintiff's wife as a "mother trucker" and joked about how various Harris family members must be dead; (3) an analysis of the types of discipline DSS employees received for conduct involving "dishonesty" or "misrepresentation" or "secondary employment," broken down by race; (4) the City's failure to follow required procedures in terminating Plaintiff; and (5) the City's failure to clearly explain Plaintiff's wrongdoing. The proffered evidence is insufficient to give rise to an inference of discriminatory intent.

To begin with, the references to Plaintiff as a "minority male" in the Ethics Board's advisory opinion provide no evidence of discriminatory intent. Each of these references is made in the context of discussing Dean Trucking's application to the City's Department of Procurement Services for certification as a Woman-owned, Minority-owned, and Disadvantaged Business Entity ("WMDBE"). Specifically, the advisory opinion quotes the Department of Procurement Services's report regarding Dean Trucking's application, in which the Department concluded that Dean Trucking was not eligible to receive certification as a Woman-owned business because "'the qualifying female shareholder seems to lack the necessary expertise to operate this type of business' and 'applicant form is reliant on minority male, especially Donnell Harris for its operation.'" Ex. V.

Even if racial animus could be inferred from the references to Plaintiff as a minority, the connection between the Ethics Board's advisory opinion and Plaintiff's termination is too attenuated for statements in the opinion to constitute circumstantial evidence of discrimination. It is undisputed that the Ethics Board did not participate in the decision to terminate Plaintiff's

employment. And while the Ethics Board's conclusion that Plaintiff violated the Ethics Ordinance may have influenced the termination decision, the hearing officer reached the same conclusion after holding a four day hearing regarding Plaintiff's alleged misconduct. Furthermore, the full HR Board upheld that conclusion following oral argument. Therefore, the City independently investigated the Ethics Board's conclusion, such that any animus cannot be imputed to the City. See *Brewer v. Bd. of Trs.*, 479 F.3d 908, 920 (7th Cir. 2007) (holding that, in the context of "an employee's discipline for particular misconduct[,] * * * even where a biased employee may have leveled false charges of misconduct against the plaintiff, the employer does not face Title VII liability so long as the decision maker independently investigates the claims before acting").

Likewise, the 2004 e-mail exchange between Benson and Esquivel does not give rise to an inference of intentional discrimination. As an initial matter, the reference to Plaintiff's wife as a "mother trucker" and the other comments about Plaintiff's family members are not facially discriminatory, and Plaintiff has provided no basis for inferring that they were motivated by hostility to his race. And even if these comments were related to Plaintiff's race, they were made in 2004, two years before Plaintiff's employment was terminated. See *Hasan v. Foley & Lardner LLP*, 552 F.3d 520 (7th Cir. 2008) (noting that "the recency of discriminatory comments * * * is relevant to whether they help to build a total picture of discrimination"). While "recency alone" cannot be "the decisive factor" in the Court's determination of whether the comments provide evidence of discriminatory intent, a two year time span certainly limits any probative value these remarks might have. See *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (finding that comments made more than a year before plaintiff's termination did not merit consideration as evidence of discrimination). Moreover, Benson and Esquivel were not

involved in the City's decision to discharge Plaintiff. See *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000) ("the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the *decision* had a discriminatory motivation").

Plaintiff also submits statistical evidence showing that black DSS employees were punished more severely by the City than non-black DSS employees for the same offenses. For example, Plaintiff's statistics show that 26.7% of the black DSS employees disciplined for conduct involving "dishonesty" or "misrepresentation" or "secondary employment" were terminated, while only 9% of Hispanics and 0% of whites disciplined for conduct involving "dishonesty" or "misrepresentation" or "secondary employment" were terminated. According to Plaintiff, these numbers demonstrate that the decision to terminate him was caused by invidious discrimination. However, Plaintiff's statistics hardly compel this conclusion.

Plaintiff merely characterizes the other employees' conduct as involving "dishonesty" or "misrepresentation" or "secondary employment," but these classifications provide no basis for comparing the severity of the other employees' misconduct with his own. Labels such as "misrepresentation," "false statements," and "falsification" no doubt embrace a broad range of conduct, only some of which would merit termination. And the only other employee disciplined for "secondary employment" also was fired. "Statistical evidence is only helpful when the plaintiff faithfully compares one apple to another." *Hemsworth*, 476 F.3d at 492. Here, Plaintiff does not provide sufficient context for the Court to determine whether he is in fact comparing apples to apples. Therefore, Plaintiff's statistical evidence is unconvincing. See *id.* at 492 (rejecting plaintiff's proposed statistical evidence where it lacked "the necessary context needed for a meaningful comparison"); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.,*

328 F.3d 309, 319 (7th Cir. 2003) (noting "the importance of looking to the proper base 'group' when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves").

Plaintiff also points to the City's alleged failure to clearly explain his wrongdoing as circumstantial evidence that his termination was motivated by discriminatory animus. As noted above, it is undisputed that on November 29, 2006, Williams gave Plaintiff copies of the Inspector General's report and the Board of Ethics Advisory Opinion. Both of those documents explained the City's case against Plaintiff in adequate detail. The Inspector General's report, in particular, identified the specific conduct associated with each of Plaintiff's alleged violations. For example, the report explains that Plaintiff violated Personnel Rule XVIII, Section 1, Paragraph 31 by "[keeping] and us[ing] a Dean Trucking radio in his City sweeper." Therefore, Plaintiff's claim that the City failed to explain the basis for his termination is meritless.

Finally, Plaintiff contends that the City's failure to follow procedures required by the CBA and Personnel Rules in terminating him. An employer's failure to follow its own internal disciplinary procedures may support an inference of discrimination. *Lewis v. School Dist. #70*, 523 F.3d 730, 743 (7th Cir. 2008). However, assuming that the City did fail to follow its own disciplinary procedures, that alone is not sufficient to support an inference of discriminatory intent. In sum, Plaintiff has failed to present sufficient circumstantial evidence of discriminatory intent to proceed under the direct method of proof.

### 2.    Indirect Method

Under the indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. 792, 802-04 (1973). In order to establish a *prima facie* case of discrimination, a plaintiff must show that: (1) he was a

member of a protected class; (2) he was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Fane*, 480 F.3d at 538; *Essex v. United Parcel Svc., Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is a mere pretext. *Fane*, 480 F.3d at 538. To establish pretext, the plaintiff must adduce specific facts that show either that the defendant was motivated by a discriminatory reason or that the defendant's explanation is unworthy of credence – essentially, that the defendant's explanation is a lie. See *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003). The plaintiff can accomplish this by demonstrating that the proffered reason (1) has no basis in fact, (2) did not actually motivate the adverse employment action, or (3) is insufficient to motivate the adverse employment action. *Velasco v. Ill. Dept. of Human Svcs.*, 246 F.3d 1010, 1017 (7th Cir. 2001); *Cliff v. Bd. of Sch. Commr's of City of Indianapolis*, 42 F.3d 403, 412 (7th Cir. 1994).

The City contends that Plaintiff has failed to establish the second and fourth elements of a *prima facie* case of discrimination. With respect to the second prong, the City maintains that Plaintiff was not meeting its legitimate performance expectations because he violated the Ethics Ordinance and Personnel Rules. Plaintiff contends that, regardless of whether he actually violated those rules, he was treated more harshly that non-black employees who committed similar violations. Seventh Circuit precedent teaches that, "where the issue is whether the

plaintiff was singled out for discipline based on a prohibited factor, it 'makes little sense * * * to discuss whether she was meeting her employer's reasonable expectations.'" *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (quoting *Flores v. Preferred Technical Group,* 182 F.3d 512, 515 (7th Cir. 1999)).  Therefore, Plaintiff is not required to show that he was meeting the City's legitimate expectations to establish a *prima facie* case of discrimination.  *Id.*

The City also argues that Plaintiff has failed to identify a similarly situated employee who was treated more favorably.  "The *prima facie* case, and specifically its fourth prong, are meant to identify situations where the 'actions taken by the employer * * * if unexplained, are more likely than not based on consideration of impermissible factors.'"  *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406 (7th Cir. 2007) (quoting *Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995)).  The Seventh Circuit recently has stated that the similarly situated inquiry is a "flexible one" that considers "all relevant factors, the number of which depends on the context of the case."  *Id.* at 405 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)).  This "*normally* entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.* (emphasis in original) (quoting *Radue*, 219 F.3d at 617-18); *cf. Warren v. Solo Cup Co.*, 516 F.3d 627, 630-31 (7th Cir. 2008) ("An employee is similarly situated if the employee is comparable to the plaintiff in all *material* respects") (internal citations omitted) (emphasis in original).

Regarding the relevant factors, "an employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Radue*, 219 F.3d at 618.  The "purpose of the similarly situated requirement is to eliminate

confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable." *Humphries*, 474 F.3d at 405. "The inquiry simply asks whether there are sufficient commonalities between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.*

Plaintiff points to the statistical evidence discussed above to support his claim that he was treated less favorably than similarly situated non-black employees. Plaintiff also identifies one potential comparator in particular – a white employee who received a 10-day suspension for "conduct unbecoming, misleading statements, insubordination, [and] discrimination." As discussed above, the labels used to describe the misconduct of Plaintiff's potential comparators are extremely broad. Without more, the Court cannot infer that the misconduct of these potential comparators was on par with, or at least substantially similar to, Plaintiff's alleged conduct. Plaintiff presents no evidence regarding the potential comparators' performance histories, or whether they dealt with the same supervisor as Plaintiff. Many of the potential comparators, including the white employee who received a 10-day suspension, were not motor truck drivers. Thus, Plaintiff has failed to "eliminate confounding variables" between himself and the potential comparators he has identified, as is required to satisfy the similarly situated requirement. *Humphries*, 474 F.3d at 405. In view of the controlling Seventh Circuit precedent cited above, the Court must conclude that Plaintiff has not presented evidence of a similarly situated comparator that would satisfy the fourth prong of the *prima facie* test, as Plaintiff must to defeat a motion for summary judgment. Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination under the indirect method. For the reasons stated above, the City's motion for summary judgment is granted as to Counts V and VII.

### D. Plaintiff's Remaining Claims

Plaintiff's remaining claims include five state constitutional claims (Counts I-V); three breach of collective bargaining agreement claims based on the City's alleged breaches of the CBA (Counts VIII-X); a state law breach of contract claim (Count XII); a declaratory judgment claim (Count XI); four state law tort claims (Counts XIII – XVI); and a common law *writ of certiorari* claim (Count XVII). Plainly, the state constitutional claims, the state law contract and tort claims, and the common law *writ of certiorari* claim arise under state law. And, as discussed below, the breach of CBA and declaratory judgment claims also are properly considered to be state law claims.

When allegations are predicated on the breach of a collective bargaining agreement, state law generally is preempted and the claims are governed by the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq.*, and federal labor law. See *In re Bentz Metal Products Co., Inc.,* 253 F.3d 283, 285-286 (7th Cir. 2004) ("it is well-understood that a claim for breach of a collective bargaining agreement is preempted" and is to be governed by substantive federal law under section 301 of the LMRA) (citing *Teamsters v. Lucas Flour Co.,* 369 U.S. 95 (1962)). However, the LMRA does not apply where the employer is "any State or political subdivision thereof." 29 U.S.C. § 152(2). Here, Plaintiff's employer was the City of Chicago – a political subdivision of the state. The breach of CBA claims set forth in Counts VIII through X thus do not arise under federal law. See *El-Amin v. AFSCME Union Local 1275*, 2003 WL 21418350, at *1 (N.D. Ill. June 19, 2003) (public employees are not covered by federal labor laws); *Bailey v. Johnson*, 1990 WL 77508, at *2 (N.D. Ill. May 30, 1990) ("An LMRA suit by a public employee against her public employer should be dismissed for lack of subject matter jurisdiction."); *Kirsch v. AFSCME Local 2645*, 2001 WL 1593140, at *1 (N.D. Ill. Dec. 13, 2001) ("the Labor

Management Relations Act, which provides the basis for a suit against the employer [for breach of a CBA], does not cover state government employers"); *Long v. City of Saginaw*, 911 F.2d 1192, 1203 (6th Cir. 1990) (dismissing LMRA claim against union by former City employees because the LMRA "exclude[s] states or political subdivisions from the definition of 'employer'").

Count XI seeks a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, that the results of the Office of Budget and Management and Inspector General's investigations are null and void on the grounds that the City breached Article 11, Section 11.1 of the CBA. "[T]he Declaratory Judgment Act is not an independent source of federal subject matter jurisdiction." *GNB Battery Technologies v. Gould, Inc.,* 65 F.3d 615, 619 (7th Cir. 1995). Therefore, this Court "must possess an independent basis for jurisdiction," such as diversity or federal question jurisdiction. *Id.* Here, because both parties are citizens of Illinois, diversity cannot be the source of jurisdiction for Plaintiff's declaratory judgment claim. Generally, whether federal question jurisdiction exists "'is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'" *Id.* (quoting *Burda v. M. Ecker Co.*, 954 F.2d 434, 438 (7th Cir. 1992)). In declaratory judgment cases, the well-pleaded complaint rule dictates that jurisdiction is determined by whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant. *Id.* In this case, Plaintiff's declaratory judgment claim is premised on the City's alleged breach of Article 11 and Section 11.1 of the CBA. As discussed above, Plaintiff's breach of CBA claims arise under state law; thus, Plaintiff's declaratory judgment claim arises under state law.

The upshot of the foregoing analysis is that all of Plaintiff's remaining claims arise under state law. Because the Court has granted summary judgment as to all claims (in Counts I through VII) over which it has original jurisdiction, it must now address whether to retain jurisdiction over those state law claims. See 28 U.S.C. § 1367(c)(3)). The Seventh Circuit consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce*, 193 F.3d at 501; *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). Finding no justification for departing from that "usual practice" in this case,[10] the Court dismisses *without prejudice* the state constitutional claims asserted in Counts I through V and the state law claims asserted in Counts VIII through XVII of Plaintiff's second amended complaint.[11]

---

[10] In *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251-53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id*. at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to refile those claims in state court. See 735 ILCS 5/13-217; *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice also is appropriate here because substantial judicial resources have not been committed to the state law counts of Plaintiff's third amended complaint. *Wright*, 29 F.3d at 1251. Finally, this is not a circumstance in which "it is absolutely clear how the pendent claims can be decided." *Id*.

[11] Other courts have dismissed Declaratory Judgment Act claims under similar circumstances. See *Zutz v. Nelson*, 2009 WL 175135, at *1 (D. Minn. Jan. 23, 2009) (dismissing all claims over which it had original jurisdiction and declining to exercise supplemental jurisdiction over claim asserted under the Declaratory Judgment Act seeking a declaration that Plaintiffs had not violated Minnesota law); *S&R Development Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 464-65 (S.D. N.Y. 2008) (declining to exercise supplemental jurisdiction over request for declaratory relief that arose under state law, noting that a declaratory judgment action must have an independent basis for subject matter jurisdiction); *Kothari v. Motiva Enterprises, L.L.C.*, 2006 WL 2129097 (S.D. Tex. July 27, 2006) (finding that no independent ground for jurisdiction existed for Plaintiff's Declaratory Judgment claim where the court had dismissed Plaintiff's federal claims and declined to exercise supplemental jurisdiction over Plaintiff's state law claims).

## III.    Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [143] as to Counts VI and VII and the federal Section 1983 claims set forth in Counts I through V of Plaintiff's second amended complaint.   In view of that disposition, which results in the dismissal of all claims over which the Court has original jurisdiction, Plaintiff's state law claims – the state constitutional claims set forth in Counts I through V and the state law claims asserted in Counts VIII through XVII of his second amended complaint – are dismissed without prejudice.   Finally, Plaintiff's motion to vacate the August 22, 2007 order of the Human Resources Board [139] – a motion that Plaintiff brought in support of one of his state law claims (Count XVII) – is stricken without prejudice.

Dated:  October 14, 2009                         _____
                                                 Robert M. Dow, Jr.
                                                 United States District Judge